UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 24-282(1) (KMM/ECW)

UNITED STATES OF AMERICA,

Plaintiff,

v.

KARAN GUPTA,

Defendant.

**GOVERNMENT'S POSITION ON SENTENCING**

## INTRODUCTION

Defendant Karan Gupta should be sentenced to 80 months in prison for his scheme to defraud Optum, Inc. and launder the proceeds. Gupta committed his crimes while abusing his trusted position as a senior director at Optum. He recruited his co-conspirator Shangraf Kaul to the scheme and directed Kaul's conduct throughout. Simultaneously, he engaged his brother to assist with the related Daaz Consulting fraud, where Gupta set up another contracting no-show job to defraud Optum. In total, Gupta's frauds caused nearly $1 million in actual loss to Optum.

This is a case that presents no mitigating evidence. Gupta didn't need the money; Optum paid him more than $260,000 annually. Gupta wasn't forced into his fraudulent conduct. He has no addiction issues. He did not suffer from a childhood marred by the kinds of hardship common among defendants in this district. There is no basis for a downward variance.

As the evidence proved at trial, Gupta's crimes warrant a serious sentence.

## BACKGROUND

The following factual summary is based on the evidence presented at trial and Probation's presentence investigative report ("PSR"):

For over a decade, Defendant Karan Gupta was a senior director at Optum, Inc. Optum is an affiliate of UnitedHealth Group—Minnesota's largest corporation and the largest healthcare company in the world. Gupta knew the company well. He'd climbed the ranks for years, eventually making more than $260,000 per year before being terminated at the end of 2019.

But Gupta's Optum salary was not enough. He wanted more. And to get more money, he abused his position of trust to exploit gaps in the systems at Optum that he'd come to know. He created no-show positions on his team in data management, from which he personally profited through kickbacks.

### I. Gupta and Kaul schemed to defraud Optum

As part of Gupta's fraud, in 2016 Gupta gave a no-show job to Shangraf Kaul in return for Kaul paying him over $185,000 in kickbacks.

Kaul was Gupta's lifelong friend. In late 2015, Gupta recruited Kaul to apply for a position as a "senior manager" of "data engineering" at Optum. Kaul was entirely unqualified. He wasn't an engineer of any kind. He had no relevant experience. The job was a full-time position, paying more than $100,000 per year. Although Kaul already had a job at another company, Gupta told Kaul that wasn't a problem.

Gupta supplied Kaul with a resume belonging to someone else who was actually qualified. Kaul swapped in his name, then submitted it to Optum. Kaul received an

interview—from Gupta. Gupta saw Kaul's fake resume, the same one Gupta had supplied to Kaul. He signed off on Kaul's hiring.

Kaul then went to "work" for Optum. But he didn't work at all. More than three years stretched by. Kaul did nothing. Kaul never met any of Gupta's other direct reports, nor any other employees at Optum.[1] He had no real activity on his calendar. He saved nothing on the company drive. His work email indicated he sent almost no email. The few emails that were sent from Kaul's email account were sent by Gupta, who had Kaul's login credentials.

Gupta knew Kaul wasn't working. Gupta wasn't having one-on-ones with Kaul. He wasn't receiving emails from Kaul. And he was constantly receiving notifications about Kaul's inactivity—that Kaul's laptop had been offline for weeks at a time, that Kaul hadn't completed mandatory trainings, and that Kaul hadn't filled out his timesheets.

All the while, Gupta profited from Kaul's no-show job. Gupta and Kaul had agreed to split Kaul's salary. It was a condition that Gupta imposed on Kaul for getting him the fake job. Throughout the scheme, Kaul kicked back more than half of his salary payments to Gupta.

## II. Gupta and Kaul conspired to hide the kickbacks from Optum, law enforcement, and the banks.

Gupta and Kaul worked to hide the kickbacks from Optum, from law enforcement, and from the banks. They did so using two approaches. For the first few years of the

[1] For example, Gupta's colleagues and nominal peers Danian Liu, Bindu Uppuluri, and Rama Khasibotla all testified that they'd never met Kaul.

scheme, they had Optum directly deposit Kaul's paychecks into Kaul's bank account. Kaul would then withdraw approximately 60% of his paychecks in cash, walk into a Wells Fargo branch location near Kaul's house in New Jersey, and deposit the cash into Gupta's account. From there, Gupta was able to access the funds from California, where he resided.

In 2018, after Gupta received notice that Wells Fargo was changing its policies to prohibit third parties from depositing cash into someone else's account, he came up with a new approach. He told Kaul to open a new bank account and divert 60% of his Optum paycheck into that account using the company's direct deposit portal. He also told Kaul to mail him the debit card for the new account, which was in Kaul's name but with Gupta's birth year as the PIN. After Gupta received the card, he used the new account to withdraw his kickback of Kaul's salary. The bank records at trial showed Gupta repeatedly withdrew funds from Kaul's new account and deposited the money in his own bank account between 2018 and 2019.

In total, over the nearly four years that Kaul was "employed" at Optum, Optum paid him approximately $556,911. After withholdings, approximately $350,778 of Kaul's pay was directly deposited in Kaul's accounts. Of that, approximately $185,201 was transferred to Gupta.

## III. Gupta's Leadership in the Scheme

There can be no doubt that Gupta was the leader in his scheme with Kaul. He recruited Kaul to the no-show job; directed Kaul to pay him the kickback; pushed Kaul to approve false timesheets; pushed Kaul to fill out forms and complete trainings; dictated to Kaul how to launder the kickback payments; gave Kaul false and fraudulent glowing

reviews at Optum, including raises and bonuses that had the effect of increasing the kickbacks Gupta received.

Gupta's own words in his text messages to Kaul showed his leadership. He texted Kaul "my [Wells Fargo] account number is . . ."; "share your password, I can login as you and do it" and "I will keep them handy for next time"; and "Bro got the card[?]" in reference to the debit card Gupta asked Kaul to send him.

## IV. The Daaz Fraud

At the same time Gupta was profiting from Kaul's no-show job, he was also profiting from another no-show-job and overbilling fraud on Optum, organized through Gupta's brother's company, Daaz Consulting.

Gupta used his position at Optum to cause Optum's prime contractor Intuitive to deliver a contract to Daaz. Gupta told neither Optum nor Intuitive that Daaz was registered to Gupta's brother, Amit Gupta. Under Gupta's direction, Intuitive subcontracted with Daaz to hire two consultants, F.K. and G.S., to work for Gupta at Optum.

Unbeknownst to Optum and Intuitive, F.K. was also working a no-show job (just like Kaul). The Gupta brothers had an agreement with F.K. that they would pay him approximately $900 per month and in return F.K. would turn over his laptop to the brothers, would do no work for Optum, and would keep quiet about the arrangement. F.K. agreed and gave Gupta his Optum laptop as soon as he received it. Later, analysis by Optum's corporate security team showed Gupta had kept F.K.'s laptop logged into Optum's servers from Gupta's home address, so that Optum would not discover F.K. was not working. From 2018 to 2019, Daaz submitted invoices for payment to Optum and Intuitive, falsely

asserting that F.K. had performed work for the company. He hadn't, as F.K. testified at trial.

Daaz also hired F.K.'s partner G.S. to serve as an Optum consultant. While G.S. did actually perform work for Optum, Daaz nonetheless overbilled for her time—billing after her work had concluded and billing for overtime she did not work.

Investigators later reviewed bank statements and saw that of the hundreds of thousands of dollars that Optum was paying to Daaz, a significant portion of those funds were being transferred from Daaz to a company called Anco, which was controlled by Gupta. Gupta profited from the frauds with F.K. and G.S.

## V. Discovery of the Kaul and Daaz Frauds

In the fall of 2019, Gupta's frauds with Kaul and Daaz Consulting fell apart. The end began with Gupta telling G.S. that her contract was being terminated. That happened shortly after G.S. had told Gupta she intended to work remotely and take time off while traveling internationally.

After the termination, G.S. was surprised to learn through friends at Optum that her account still appeared to be online. G.S. told F.K., who confronted Gupta's brother. F.K. quit his no-show job. F.K. and G.S. then reported to Intuitive and Optum their belief that Daaz was continuing to bill Optum for their work even though they'd stopped work. They also disclosed the fact that Gupta and Daaz's owner were brothers—something previously unknown to the companies.

Optum and Intuitive investigated. Optum found that Gupta's non-disclosure of his familial relationship with his brother Amit, Daaz's owner, was a conflict of interest and a

violation of company policy. They learned that yes, Daaz had falsely billed for F.K.'s and G.S.'s time, even after the pair had stopped work. Daaz had also regularly falsely billed as if G.S. had worked overtime when in fact she had not. Optum did not, however, learn that F.K. had never performed any work for Optum, because F.K. did not disclose as much. Intuitive tallied the known false billings by Daaz at $158,553. Gupta's brother agreed to repay that amount. Later, bank records showed that Gupta repaid his brother for $141,180 of the refund amount.

On November 22, 2019, Optum terminated Gupta's employment due to the Daaz fraud. The same day, Gupta—worried that Optum might now learn of the yet-undiscovered Kaul fraud—entered an away message on Kaul's Optum account, stating Kaul was on leave. Around the same time, Gupta called Kaul and told him to resign after a brief cooling off period. Kaul did exactly that.

Kaul's disappearance and resignation raised concern with Danian Liu, who took over management of Gupta's team at Optum. So did the fact that no one else on Gupta's team knew Kaul. Liu reported the matter to compliance. Optum investigated, discovered the Kaul fraud, and referred the matter to law enforcement.

In total, Gupta's frauds resulted in the following:

| | |
|---|---|
| Kaul Fraud Loss to Optum | -$556,911 |
| Daaz Fraud Loss to Optum | -$404,842 |
| Post-Discovery Repayment to Intuitive and Optum | +$158,753 |

Based on these amounts, Gupta's conduct resulted in an actual loss to Optum of $961,753, of which $803,200 has not been repaid.

## **SENTENCING GUIDELINES**

There are six areas of dispute regarding the Guidelines.

*First*, in the money-laundering conspiracy, Gupta was the organizer, leader, manager, and supervisor of Kaul in the fraud scheme. Gupta was literally Kaul's manager at Optum. Gupta hired Kaul. Gupta directed Kaul on how to launder the funds—first through the cash deposits, and later through the ATM-debit card scheme. Gupta also dictated the amounts Kaul was required to kick back. There can be no doubt, Gupta and Kaul were not peers—Gupta was the leader. Gupta should receive a 2-level increase under § 3B1.1(c) for his conviction on Count 12.

*Second*, Gupta abused his position of trust at Optum just as much in the money-laundering scheme as in the wire fraud scheme. The money-laundering conspiracy's goal was concealment from Optum, among others. The point was to engage in transactions designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of [wire fraud]." 18 U.S.C. § 1956(a)(B)(i). In other words, Gupta

wanted to hide the fact that Kaul was giving him the very money they'd fraudulently taken from Gupta's own employer. Gupta sought to hide that fact from Optum because he worked at Optum, and he was abusing his position of trust at the company for the sake of his and Kaul's fraud. As part of the conspiracy, Gupta even directed Kaul to tell Optum to split Kaul's paycheck between accounts to facilitate the laundering. Gupta's position with Optum was part and parcel of both the fraud scheme and the laundering conspiracy.

*Third*, in the alternative, even if the abuse-of-position-of-trust or aggravating-role enhancements do not apply to Count 12, the guidelines are still the same, due to the multiple-counts provisions of § 3D1.2(c) and § 3D1.4. If one or both of the two at-issue increases don't apply, Count 12's offense level would be either 23 or 25, instead of 27. That is 1 level or 3 levels less than 26, which is the offense level for the grouped Counts 1 through 11.

Under § 3D1.2(c), counts group "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." The "adjustments" referenced in this section include the role adjustments provided for in Chapter 3 of the Sentencing Guidelines. *See* U.S.S.G., ch. 3 ("Adjustments"). Here, Count 12 would not group with the fraud counts because Count 12 would not embody all of the conduct treated as an "adjustment to" the conduct for Counts 1 through 11. Specifically, Count 12 would not embody the aggravating-role and abuse-of-position-of-trust Chapter 3 adjustments that apply to Counts 1 through 11.

In that scenario, there would be two groups, one with an offense level of 26 (Cts. 1–11) and one with an offense level of 23 or 25 (Ct. 12). Because the groups diverge by 1 to

4 levels in seriousness, the total combined offense level would be the offense level for the group of Counts 1 through 11, plus one offense level. U.S.S.G. § 3D1.4(a). The total would be 27.

In other words, it is immaterial whether Gupta should receive the abuse-of-position-of-trust and aggravating-role enhancements for Count 12, because either way, the total offense level is 27.

*Fourth*, regarding the Daaz fraud, it is relevant conduct because it was part of the "acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by [Gupta]" during the course of the offenses of conviction. U.S.S.G. § 1B1.3(a). Specifically, Gupta committed the Daaz fraud and the Kaul fraud at the same time, both by abusing his position at Optum, using similar no-show-job methods, and against the same victim: Optum. The Daaz fraud is relevant conduct. Additionally, the PSR suggests an evidentiary hearing would be necessary to prove the issue. (PSR at A.2.) No evidentiary hearing is required because all of the relevant Daaz evidence was presented in the six-day trial in February.

*Fifth*, federal restitution law requires inclusion of the Daaz losses in the restitution award. Restitution extends to all victims "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Regardless of whether the Daaz fraud was extrinsic or intrinsic to the offenses charged in the indictment, it was a fraud committed "in the course of" Gupta's offenses or as part of their "pattern."

*Sixth*, on the loss amount, the PSR correctly concludes it is irrelevant whether Gupta

and Kaul split the proceeds 60-40 or 50-50. The issue is what Optum lost. And no matter the split, as indicated above, the scheme caused Optum a loss of $961,753. The government also notes that this amount not only exceeds $550,000, the relevant threshold under the Guidelines, it also exceeds $750,000, which is the updated threshold under the new guidelines amendments set to take effect on November 1, 2026. *See* U.S. Sentencing Comm'n, Amendments to the Sentencing Guidelines at 28 (Apr. 30, 2026).[2]

In sum, Gupta's total offense level is 27, the guidelines range of imprisonment is 70 to 87 months, and the restitution award should be $803,200.

**<u>THE APPROPRIATE SENTENCE</u>**

The government respectfully requests that the Court impose a sentence of 80 months of imprisonment. That is the appropriate sentence for three core reasons.

*First*, Gupta's fraud was highly serious. Gupta deliberately exploited his employer's trust to not only hire Kaul, who was an unqualified, personal friend, who did no work for Optum, but also to divert a significant percentage of Kaul's salary to his own coffers. This was money that Gupta was not entitled to and yet funds he repeatedly took, over and over. Gupta's efforts to avoid discovery of the scheme by Optum, by preventing the company from finding out that Kaul was not working, and by the banks, by preventing them from learning of the laundering that was going on, were extensive. The fact that Gupta engaged in multiple, simultaneous schemes to defraud his employer through no-show jobs demonstrate how far Gupta went to profit at the expense of Optum. Gupta's

[2] https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202605_RF.pdf.

motivation was nothing more than a desire for more money. It was greed.

*Second*, Gupta requires specific deterrence. Almost categorically, fraud defendants tend to "act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Warner*, 792 F.3d 847, 860–61 (7th Cir. 2015). That fact necessitates a sentence that will convince them that their calculus was wrong, to show them that committing future frauds would not be worth it. *Id.*; *see also United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (concluding that fraud defendants are ripe for deterrence because "economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity"). Here, Gupta's crimes were calculated and intentional, every step of the way. He crafted two different fraud schemes, one with his brother's consulting firm, the other with an old family friend. Each was creative. And each was successful, going unnoticed for years.

There is no mitigating evidence. Gupta has never argued that he didn't commit his frauds. He has never taken responsibility. Instead, he has argued only that his crimes were outside the statute of limitations, that the use of an interstate wire wasn't proved, and that his overt acts were too old. This case imposes a strong need for specific deterrence.

*Third*, general deterrence must work to prevent others from committing crimes like Gupta's. The need for general deterrence is greatest for crimes that offer large payouts yet are difficult to detect. For example, in cases of corporate embezzlement, the defendants perform a cost-benefit analysis, weighing the risk of apprehension against the available windfall. It is necessary for courts to weigh in and tell the public and anyone contemplating a similar crime that such conduct will be met with a serious sentence. *See United States v.*

*Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish."). Gupta's sentence in this case must show the public that the payoff is not worth the price.

**CONCLUSION**

In conclusion, Gupta should be sentenced to 80 months of imprisonment and ordered to repay $803,200 in restitution to his victims.

Date: August 19, 2026

Respectfully submitted,

DANIEL N. ROSEN
United States Attorney

*/s/ Matthew D. Forbes*
MATTHEW D. FORBES
REBECCA E. KLINE
Assistant U.S. Attorneys